UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PEARSON EDUCATION, INC.,

                Plaintiffs,

- against -

GANGHUA LIU, ET AL.,

                Defendants.

1:08-cv-06152-RJH

**MEMORANDUM OPINION AND ORDER**

---

Richard J. Holwell, District Judge:

       Through this action, two U.S. copyright holders seek to prevent the importation and resale of copies of their works that have been lawfully manufactured and purchased outside the United States, a form of arbitrage sometimes referred to as "parallel importation" through the "grey market." Defendants have moved to dismiss the complaint on the ground that their activities are protected by the first-sale doctrine, the rule that the purchaser of a physical copy of a copyrighted work may give or sell that copy to someone else without infringing the copyright owner's exclusive distribution rights. Although the question of whether the first-sale doctrine applies to copies of a copyright work that have been lawfully manufactured abroad is an open question in this circuit, the Supreme Court has said, in unanimous dicta, that the doctrine does not apply to copies of a copyrighted work manufactured abroad. Because the case for a contrary interpretation is not so strong as to justify disregarding the Supreme Court's considered views, defendants' motion to dismiss will be denied.

- 1 -

**I.**

As the case is before the Court on defendants' motion to dismiss, the Court takes the allegations of the complaint as true and draws all reasonable inferences in plaintiffs' favor. *E.g.*, *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 124 (2d Cir. 2009).

Plaintiffs, Pearson Education, Inc. and John Wiley & Sons, Inc., publish educational books throughout the world. (Compl. ¶¶ 10, 14-15.) As part of their regular business, plaintiffs require authors to assign them copyrights for works they publish, or to grant to them the exclusive right to reproduce and distribute their works in the United States. (*Id.* ¶ 11.) Plaintiffs also own a number of well-known trademarks, which they use to differentiate their products in the marketplace. (*Id.* ¶¶ 17-19.)

The textbooks plaintiffs publish are customized for the geographical markets in which they are sold. Editions authorized for sale in the United States are of the highest quality, and are printed with strong, hard-cover bindings with glossy protective coatings. (*Id.* ¶ 14.) Sometimes, plaintiffs include academic supplements, such as CD-ROMs or passwords to restricted websites, with these books. (*Id.*) Editions authorized for sale outside of the United States, by contrast, have thinner paper, different bindings, different cover and jacket designs, fewer ink colors, and lower-quality photographs and graphics. (*Id.* ¶ 15.) These foreign editions are not bundled with academic supplements such as CD-ROMs. (*Id.*) The cover of a foreign edition may include a legend indicating that the book is a "Low Price Edition" or only authorized for sale in a particular country or geographic region. (*Id.*) The foreign editions are uniformly manufactured outside the United States. (*Id.*)

Defendants can reasonably be described as small-time internet entrepreneurs. They purchase plaintiffs' low-priced foreign editions abroad, import them into the United

States, then sell them to U.S. customers using websites maintained by third parties. (*Id.* ¶¶ 6-9, 20.) Plaintiffs allege that "Defendants have without permission purchased Foreign Editions of plaintiffs' books manufactured outside of the United States and resold them to purchasers in the United States through the Internet using the username 'JMBooks' at . . . websites including, but not limited to, Valorebooks.com." (*Id.* ¶ 20.)[1] The complaint does not allege that any of the copies sold by defendants are piratical (i.e., unauthorized or counterfeit), manufactured without plaintiffs' consent, or not owned by defendants. Plaintiffs demand preliminary and permanent injunctions enjoining defendants from selling foreign editions of their copyrighted books in the United States, damages, and attorneys' fees.

Defendants have moved to dismiss the complaint. They principally contend that their importation and sale of plaintiffs' foreign editions does not infringe plaintiffs' copyrights, because their actions are protected by the first-sale doctrine codified in § 109 of the Copyright Act, 17 U.S.C. § 109 (2006). Defendants further contend that because plaintiffs' trademark claims are derivative of their copyright claims, those claims fail as a matter of law.

## II.

Defendants' motion raises the question whether the importation and sale of copies of a copyrighted work that were lawfully manufactured abroad violates a U.S. copyright owner's exclusive rights. Three sections of the Copyright Act are relevant to that question: (i) § 106(3), the Act's rights-granting provision; (ii) § 109(a), the Act's

---

[1] The referenced website describes itself as "the student's #1 marketplace to buy cheap textbooks for college." Valorebooks homepage, http://www.valorebooks.com/ (last visited Sep. 19, 2009).

- 3 -

codification of the first-sale doctrine; and (iii) § 602(a), which is entitled "Infringing importation of copies or phonorecords."

### A.      Section 106(3)

Section 106(3) grants the owner of a U.S. copyright, "[s]ubject to sections 107 through 122," the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending . . . ."  In contrast to the core copyright rights of reproduction and adaptation, the distribution right is a right to control *use*.  *See* John M. Kernochan, *The Distribution Right in the United States of America: Review and Reflections*, 42 Vand. L. Rev. 1407, 1416-17 (1989).  It primarily protects a copyright owner's ability to control the terms on which her work enters the market by providing a remedy against persons who distribute copies of her work without permission.  *See* 2 Nelville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.12[A], at 8-154 (2008) ("Nimmer").  Thus, although the language of § 106(3) seemingly gives a copyright owner unlimited control over commercial transactions involving copies of her work, it has long been recognized that the principal effect of the distribution right is to give a copyright holder "a right to control the work's *publication*."  *Id.* § 8.11[A], at 8-148 (emphasis added).

### B.      Section 109(a)

This limitation on scope of the distribution right, known as the first-sale doctrine, is codified in § 109(a) of the Act.  The doctrine originates in *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908), a case decided under the Copyright Act of 1891.  There, a publisher attached a notice to the copyright page of a book which provided that the book could not be sold for less than a dollar.  *Id.* at 341.  Acting in defiance of this price control,

defendants bought copies of the book at wholesale and resold them for eighty-nine cents. *Id.* at 342.  The publisher sued, arguing that defendants' "unauthorized" (albeit pro-competitive) sales of the book violated its exclusive right to "vend" under § 1(a) of the 1891 Act.  *Id.* at 343.

The Supreme Court rejected the publisher's argument, holding that "[t]he purchaser of a book, once sold by authority of the owner of the copyright, may sell it again, although he could not publish a new edition of it."  *Id.* at 350.  As the Court explained, a copyright owner who purposefully transfers ownership of a copy of her work chooses the terms on which the work enters the market.  *See Bobbs-Merrill*, 210 U.S. at 351; *see also Platt & Munk Co. v. Republic Graphics, Inc.*, 315 F.2d 847, 854 (2d Cir. 1963).  The purpose of the distribution right thus having been satisfied, "the policy favoring a copyright monopoly for authors gives way to the policy opposing restraints of trade and restraints on alienation."  2 Nimmer § 8.12[A], at 8-155.  Accordingly, the Court ruled that the publisher's right to "vend" copies of its work did not encompass the right to control the terms of subsequent sales.  *Bobbs-Merrill*, 210 U.S. at 351.

The outcome reached by the Court can also be justified by considering the prohibitive transaction costs of affording a copyright holder an unlimited right to control the terms under which her work is sold.  "[S]uccessive possessors of the copy or phonorecord should not be put to the trouble of having to negotiate with the owner each time they contemplate a further sale or other transfer of the copy or phonorecord."  2 Paul Goldstein, *Goldstein on Copyright* § 7.6.1, at 7:131 (2005).  If a copyright owner wishes to control future sales, she can lease or rent copies of her work rather than selling them,

- 5 -

*see id.*, or, if copies are sold, contractually limit their distribution (consistent with provisions of the antitrust laws).

Congress codified the first-sale doctrine in the Copyright Acts of 1909, 1947, and 1976. Section 41 of the 1909 Act, which appears in identical form in § 27 of the 1947 Act, provides in relevant part that "nothing in this Act shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained." Pub. L. No. 60-349, 35 Stat. 1075, 1084 (1909); Pub. L. No. 80-281, 61 Stat. 652, 660 (1947). Section 109 of the 1976 Act provides in relevant part that,

> Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

17 U.S.C. § 109. In *Quality King Distributors, Inc. v. L'anza Research International, Inc.*, 523 U.S. 135 (1998), the Supreme Court noted that "[t]here is no reason to assume that Congress intended either § 109(a) or the earlier codifications of the doctrine to limit its broad scope." *Id.* at 152. This understanding is consistent with the House Committee on the Judiciary's report on the 1976 Act. *See* H.R. Rep. No. 1476, at 79 (1979) ("Section 109(a) restates and confirms the principle that, where the copyright owner has transferred ownership of a particular copy or phonorecord of a work, the person to whom the copy or phonorecord is transferred is entitled to dispose of it by sale, rental, or any other means."), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5693.

**C.     Section 602(a)**

Section 602(a) addresses the extent to which the distribution right allows a copyright owner to also control the importation of copies of her work. It provides in part that,

> Importation into the United States, without the authority of the owner of copyright under this title, of copies or phonorecords of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies or phonorecords under section 106, actionable under section 501.

17 U.S.C. § 602(a).

In view of § 602(a)'s position in a separate chapter of the Copyright Act, as well as the statute's unqualified reference to *all* copies acquired outside the United States, one might suppose that Congress intended to give copyright owners authority to restrict the importation of copies of a work without regard to the first-sale doctrine, and without regard to the other limitations on a copyright owner's exclusive rights in sections 107 through 122 of the Act. The Supreme Court, however, has rejected this broad reading of the statute.

In *Quality King*, a California-based manufacturer, L'Anza Research International, sold several tons of beauty products bearing its copyrighted labels to a distributor in Malta with the apparent understanding that the products would only be offered for sale outside the United States. 523 U.S. at 138-39. Like plaintiffs here, L'Anza charged different prices for its goods depending on the market they would be sold in. *See id.* at 139. After the shipment made its way back to the United States, L'Anza sued salons that had purchased and resold its "unauthorized" products. It contended that "the importation and subsequent distribution" of its copyrighted labels violated its exclusive rights under §§ 106, 501, and 602 of the Copyright Act. *Id.* at 139-40.

The Supreme Court rejected this argument and held that a copyright owner's § 602 right to control the importation of copies of her work is a species of § 106(3)'s distribution right, which is subject to the first-sale doctrine. *See id.* at 149.  The Court reasoned that the plain text of § 602(a) provides that "importation is an infringement of the exclusive right to distributed copies '*under section 106*.'" *Id.* at 144 (quoting § 602(a)).  Because § 106 grants a copyright owner exclusive rights "[s]ubject to sections 107 through 122," the copyright owner's power to limit importation is qualified by the first-sale doctrine.  *Id.* at 144-45.

Although *Quality King* clarified that the first-sale doctrine was not limited by the place where an initial transfer of ownership occurred, the Court did not resolve whether the place a copyrighted good was manufactured mattered for first-sale purposes.  As Justice Ginsburg noted in a brief concurrence, the case "involve[d] a 'round trip' journey, travel of the copies in question from the United States to places abroad, then back again." *Id.* at 154 (Ginsburg, J., concurring).  Thus, the Court's decision did not "resolve cases in which the allegedly infringing imports were manufactured abroad." *Id.*  In dicta, however, the Court suggested that the first-sale doctrine did not extend to copies of a work manufactured abroad.  *Id.* at 148 (opinion of the Court); *see infra* § IV.

### III.

In view of *Quality King*'s holding that § 602(a)'s "distribution right" is subject to the first-sale doctrine in cases involving a "round trip" transaction, the question presented by defendants' motion is narrow:  Is the first-sale doctrine also applicable when a copy of a copyrighted work is manufactured abroad and imported into the United States?

If the Court were to limit its consideration to the traditional tools of statutory interpretation, it likely would answer that question in the affirmative.  Section 109(a)

provides that "the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy . . . ."  By § 109(a)'s terms, the first-sale doctrine applies if two conditions are satisfied.  First, the person claiming the doctrine's protection must hold title to a particular copy: that person must be "*the owner*" of the copy.  And second, the copy must have been "lawfully made under this title."

Courts have divided over what it means for a copy to be "lawfully made under this title."  § 109(a); *compare Columbia Broad. Sys., Inc. v. Scorpio Music Distribs., Inc.*, 569 F. Supp. 47, 49 (E.D. Pa. 1983) (Green, J.), *aff'd without op.*, 738 F.2d 421 (3d Cir. 1984), *with Sebastian Int'l Inc. v. Consumer Contacts (Pty) Ltd.*, 847 F.2d 1093, 1098 n.1 (3d Cir. 1988).  On one hand, some courts have held that because a U.S. copyright holder cannot sue a foreign manufacturer for violating her exclusive right to reproduce a copyrighted work in copies, *see* 17 U.S.C. § 106(1); *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988), a copy manufactured abroad is born in a state of legal limbo, neither legal nor illegal as a matter of U.S. law.  On this view, a copy of a copyrighted work is not "lawfully made under this title" unless it also is "legally manufactured . . . within the United States."  *Scorpio*, 569 F. Supp. at 49.  Other courts have "confess[ed] some uneasiness with this construction," implicitly suggesting that "lawfully made under this title" refers not to the *place* a copy is manufactured, but to the *lawfulness* of its manufacture as a function of U.S. copyright law.  *See Sebastian Int'l*, 847 F.2d at 1098 n.1.

- 9 -

In this Court's view, the second interpretation is the better one. Starting with the language of the statute, the focus of § 109(a) is on whether a particular copy was manufactured lawfully. The statute provides that to be subject to the first-sale doctrine, "a particular copy or phonorecord" must be "lawfully made." It then specifies which jurisdiction's law controls this determination. For the first-sale doctrine to apply, a copy must be "lawfully made under this title"—that is, lawfully made under the standards of Title 17 of the United States Code. A copy is not "lawfully made under this title," by contrast, if its manufacture was only lawful under some other source of law. Stated differently, § 109(a) teaches that for first-sale purposes, the lawfulness of a particular copy or phonorecord should be judged by U.S. copyright law no matter where the copy or phonorecord was manufactured. In the normal run of cases, this condition will be satisfied if the copy was manufactured by the U.S. rightsholder, *see* § 106(1); if the U.S. rightsholder authorized the copy to be manufactured, *see Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998); or if the manufacturer's activities would be privileged under U.S. concepts of fair use, *see* § 107.

The structure of the statute confirms what its text suggests. Throughout the Copyright Act of 1976, Congress used "under this title" to describe the scope of the rights created by the Act, not the place a copy or phonorecord was manufactured. Thus, § 101 excludes from the definition of "[a] work of visual art" any work "not subject to copyright protection under this title"; § 104(a) provides that certain works, "while unpublished, are subject to protection under this title without regard to the nationality or domicile of the author"; § 105 provides that "[c]opyright protection under this title is not available for any work of the United States Government"; § 106 provides that "the owner

of copyright under this title has the exclusive rights to do and to authorize any of the following . . . ";  and § 201(a) provides that "[c]opyright in a work protected under this title vests initially in the author or authors of the work."

In contrast, "[w]hen Congress considered the place of manufacture to be important, . . . the statutory language clearly expresses that concern." *Sebastian Int'l*, 847 F.2d at 1098 n.1.  Most notably, § 601(a) of the Act, the so-called "manufacturing requirement," provides that:

> Prior to July 1, 1986, and except as provided by subsection (b), the importation into or public distribution in the United States of copies of a work consisting preponderantly of nondramatic literary material that is in the English language and is *protected under this title* is prohibited unless the portions consisting of such material have been *manufactured in the United States or Canada*.

17 U.S.C. § 601(a) (emphasis added).  Section 1001, added by the Audio Home Recording Act of 1992, Pub. L. No. 102-563, 106 Stat. 4237 (1992), likewise refers to a copy's place of manufacture.  17 U.S.C. § 1001(8) ("To 'manufacture' means to produce or assemble a product in the United States.").

Turning to the history and purposes of the first-sale doctrine, nothing suggests that the doctrine should not apply when a copy is manufactured abroad.  First, the common law policy against restraints on trade and alienation is not limited by the place a chattel is manufactured; a prohibition against selling books manufactured in China is just as much a restraint on trade and alienation as a prohibition against selling books manufactured in Chicago.  The early Copyright Acts reflect this principle.  Under the 1909 and 1947 Acts, the first-sale doctrine applied to "*any* copy of a copyrighted work the possession of *which has been lawfully obtained*."  Pub. L. No. 60-349, 35 Stat. 1075, 1084 (1909); Pub. L. No. 80-281, 61 Stat. 652, 660 (1947) (emphasis added).  *Cf. Quality*

*King*, 523 U.S. at 152 ("There is no reason to assume that Congress intended either § 109(a) or the earlier codifications of the doctrine to limit its broad scope.").

Justifications for the first-sale doctrine that are framed in explicitly economic terms likewise argue against limiting the doctrine to copies manufactured in the United States. Granting a copyright holder the unlimited power to control commercial transactions involving copies of her work creates high transaction costs regardless of where a copy is manufactured; indeed, the transaction costs of negotiating the terms of future sales will almost certainly be *higher* when a copy is manufactured abroad. And when a copyright owner manufacturers copies of her work abroad, the Copyright Act fully protects her right to bring her work to market on terms of her own choosing; it is only when someone else becomes the "owner" of a "particular copy or phonorecord" that the first-sale doctrine takes effect. To be sure, it might be objected that a copyright owner who sells her work abroad receives less than the "full" value of the work measured by the prices charged in more affluent markets. But the objection depends on the assumption, unknown to modern economic theory, that a voluntarily-negotiated sale is not "fair" because the seller could have exacted a higher price from an alternative buyer in a more affluent market. *Cf.* Jamie S. Gorelick & Rory K. Little, *The Case for Parallel Importation*, 11 N.C. J. Int'l L. & Com. Reg. 205, 207 (1986) ("Parallel importers only buy goods at prices that foreign manufacturers are willing to sell the goods. Original trademark owners are not forced to sell in foreign markets at prices that encourage parallel importation.").

The unusual consequences that follow from limiting the first-sale doctrine to copies manufactured in the United States further argue against limiting the doctrine based

on the place a copy is manufactured. As the Ninth Circuit has acknowledged, a reading of § 109(a) that equates "lawfully made under this title" with "made in the United States" prevents the first-sale doctrine from ever applying to a copy or phonorecord manufactured outside the United States. *Parfums Givenchy, Inc. v. Drug Emporium, Inc.*, 38 F.3d 477, 482 n.8 (9th Cir. 1994). Because a copy must be "lawfully made under this title" for the first-sale doctrine to apply, a subsequent purchaser can never "sell or otherwise dispose of the possession of that copy or phonorecord" without the permission of the copyright owner. 17 U.S.C. § 109(a).

In *Parfums Givenchy*, the court suggested in dicta that the solution to this dilemma was to hold that a copy or phonorecord manufactured abroad is not subject to the first-sale doctrine "unless and until there has been a 'first sale' *in the United States*." 38 F.3d at 481 n.8 (emphasis in original). Later Ninth Circuit cases adopted this dictum as a holding of the court. *Denbicare U.S.A. Inc. v. Toys R Us, Inc.*, 84 F.3d 1143, 1150 (9th Cir. 1996) ("[U]nder the law of the circuit, § 109 applies to copies made abroad only if the copies have been sold in the United States by the copyright owner or with its authority."); *Omega S.A. v. Costco Wholesale Corp.*, 541 F.3d 982, 986 (9th Cir. 2008) ("§ 109(a) can apply to copies not made in the United States so long as an authorized first sale occurs here."), *petition for cert. filed*, 77 U.S.L.W. 3657 (May 18, 2009). But the court has never explained how § 109(a)'s text supports a distinction based on where a first sale occurred. And the distinction it has drawn conflicts directly with *Quality King*'s holding that place of sale is irrelevant for first-sale purposes. *See Quality King*, 523 U.S. at 145 ("After the first sale of a copyrighted item 'lawfully made under this title,' any subsequent purchaser, whether from a domestic or from a foreign reseller, is obviously an

'owner' of that item" protected by the first-sale doctrine."). Thus even if this Court were tempted to follow the Ninth Circuit's interpretation of § 109(a) as a way of giving effect to the supposedly conflicting policies of §§ 109(a) and 602(a), it could not do so without disregarding an express holding of the Supreme Court.

Lastly, the frequently-repeated argument that applying the first-sale doctrine to copies of a copyrighted work manufactured abroad would render § 602(a) "virtually meaningless," *Scorpio*, 569 F. Supp. at 49, provides scant support for limiting the first-sale doctrine to domestically-manufactured copies. The standard citation for that argument is a statement in the House Committee on the Judiciary's report that "any unauthorized importer of copies or phonorecords acquired abroad could be sued for damages and enjoined from making any use of them . . . ." H.R. Rep. No. 1476, at 170. *See, e.g.*, *Parfums Givenchy*, 38 F.3d at 482 n.8. But read as a whole, § 602(a)'s legislative history is at best ambiguous as to whether the drafters of the 1976 Act intended that § 602(a) would make the first-sale doctrine inapplicable to copies of a copyrighted work manufactured abroad. Kernochan, *supra*, at 1418 ("The legislative history . . . is rather ambiguous on the effect of section 602(a) in nonpiracy situations and contains material that could support either [a broad or a narrow reading]."); *see also* William C. Tyson & Robert P. Parker, *Parallel Importation of Copyrighted Phonorecords*, 10 N.C.J. Int'l L. & Com. Reg. 397, 406 (1985); Stephen W. Feingold, *Parallel Importing Under the Copyright Act of 1976*, 17 N.Y.U. J. Int'l L. & Pol. 113, 138 (1984). In any event, § 602(a) continues to apply to copies of a work that are not the subject of a first sale, a scenario expressly contemplated by § 602(a)'s legislative history; and there clearly exist circumstances where a copy is *not* lawfully manufactured under

the standards of Title 17 but *is* lawfully manufactured under the standards of some other source of law.  A copy, for example, might be manufactured pursuant to a compulsory license required by foreign law, *see, e.g.*, *T.B. Harms Co. v. Jem Records, Inc.*, 655 F. Supp. 1575, 1577 (D.N.J. 1987) (compulsory license under New Zealand Copyright Act), or it might be manufactured in a country with no copyright law at all.  In these circumstances, importation of copies without the copyright holder's authorization remains actionable under § 602(a).

For these reasons, the Court provisionally is of the view that nothing in § 109(a) or the history, purposes, and policies of the first-sale doctrine, limits the doctrine to copies of a work manufactured in the United States.

## IV.

This analysis, however, overlooks an important piece of data:  In *Quality King*, the Supreme Court spoke directly to whether the first-sale doctrine applies to copies manufactured abroad.  In the course of addressing the argument that applying the first-sale doctrine to § 602(a) would render that section meaningless, the Court noted that even limited by the first-sale doctrine, § 602(a) gives U.S. copyright holders an important bundle of rights.  First, § 602(a) gives copyright owners a private remedy against importers of piratical copies, a power absent in previous versions of the Copyright Act.  *Quality King*, 523 U.S. at 146.  Second, because the first-sale doctrine is only available to the "owner" of a lawfully made copy, § 602(a) allows a copyright holder to prohibit imports by someone who does not hold title to the copies in question, such as a bailee, licensee or consignee, or a person who acquired possession of a copy unlawfully.  *Id.* at 146-47.  And third, "§ 602(a) applies to a category of copies that are neither piratical nor 'lawfully made under this title.'"  *Id.* at 147.

This last category clearly includes copies produced under a foreign compulsory license and copies produced in nations with no copyright law. But as a further example, the Court noted that § 602(a) gives a copyright owner the power to prohibit the importation of copies manufactured abroad with the U.S. rightsholder's authorization. Citing a variety of extratextual sources, the Court stated:

> If the author of the work gave the exclusive United States distribution rights—enforceable under the Act—to the publisher of the United States edition and the exclusive British distribution rights to the publisher of the British edition, . . . presumably only those made by the publisher of the United States edition would be "lawfully made under this title" within the meaning of § 109(a). The first sale doctrine would not provide the publisher of the British edition who decided to sell in the American market with a defense to an action under § 602(a) (or, for that matter, to an action under § 106(3), *if there was a distribution of the copies*).

*Id.* at 148 (emphasis added and footnote omitted) (citing *Copyright Law Revision Part 4: Further Discussion and Comments on Preliminary Draft for Revised U.S. Copyright Law*, 88th Cong., 2d Sess., 119, 209 (H.R. Judiciary Comm. Print 1964) (statements of Mrs. Pilpel and Mr. Manges)). Thus, the Court appears to have specifically considered the fact pattern presented by this case: one in which books manufactured by a foreign publisher for sale abroad are imported into, and distributed within, this country without the consent of the U.S. copyright holder. The Court expressed the view that in these circumstances, the U.S. copyright holder is entitled to maintain an infringement action against the importer under § 602(a).

As this Court has reasoned previously, "if dicta this be, it is of the most persuasive kind." *Arnold's Wines, Inc. v. Boyle*, 515 F. Supp. 2d 401, 412 (S.D.N.Y. 2007) (Holwell, J.), *aff'd*, 571 F.3d 185 (2d Cir. 2009). When the Supreme Court addresses an unsettled question of federal law in unanimous dicta, respect for the Supreme Court as an institution and the dedicated jurists who serve on it mandates

deference in all but the most exceptional circumstances. "[L]anguage the Supreme Court uses when it explicitly announces its holding must be assumed to have been crafted with care . . . ." *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 250 (2d Cir. 1999). *See, e.g.*, *Jones v. St. Paul Cos., Inc.*, 495 F.3d 888, 893 (8th Cir. 2007); *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003).

In this Court's view, this case comes close to demonstrating such exceptional circumstances—but not quite. As demonstrated by the decades-old tension in circuit law, reasonable jurists can, and do, disagree about the first-sale doctrine's application to copies manufactured abroad. While this Court would not limit the doctrine to copies manufactured in the United States, the case for this interpretation of § 109(a) is not so overwhelming as to justify disregarding the Supreme Court's views. "Lawfully made under this title" can plausibly be read to refer to the jurisdiction in which a copy is manufactured. And as the Court noted in *Quality King*, this understanding of the first-sale doctrine is supported by at least some of § 602(a)'s legislative history. *See* 523 U.S. at 148. This Court therefore holds, *dubitante*, that the first-sale doctrine does not apply to copies of a copyrighted work manufactured abroad.

## V.

Under this reading of the Copyright Act, the complaint states a claim upon which relief can be granted. It alleges that defendants purchased foreign editions of plaintiffs' books manufactured abroad and resold them to purchasers in the United States after importing the books into this country. Because the foreign editions were manufactured abroad, defendants did not acquire ownership of copies "lawfully made under this title." § 109(a). Indeed, defendants can *never* claim the protection of the first-sale doctrine as to plaintiffs' foreign editions. *See supra* p. 12. Defendants' activities therefore are actionable under §§ 106(3), 501, and 602(a) of the Act.

Defendants' motion to dismiss **[10]** is denied.

SO ORDERED.

Dated: New York, New York
       September **25**, 2009

Richard J. Holwell
United States District Judge