UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **MAY 2 2 2014**

PEARSON EDUCATION, INC. and :
JOHN WILEY & SONS, INC., :
                                                          :
                    Plaintiffs, :                08 Civ. 6152 (KBF)
                                                          :
          -v-                                        :        OPINION & ORDER
                                                          :
                                                          :
ALLEN AIR CONDITIONING CO., et al., :
                                                          :
                    Defendants. :
-------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

Before this Court is plaintiffs and Counterclaim-defendants Pearson

Education, Inc.'s ("Pearson") and John Wiley & Sons, Inc.'s ("Wiley") (together,

"Publishers") motion to dismiss defendant and Counterclaim-plaintiff Ganghua

Liu's ("Liu") first amended Counterclaims. The amended Counterclaims asserts

antitrust violations arising under Sections 1 and 2 of the Sherman Act, as well as

state law claims for tortious interference with existing and prospective business

relationships. (See Defendant Ganghua Liu's First Amended Counterclaims

("FAC") ¶¶ 102-138, Dec. 4, 2013, ECF No. 108.)

Liu, a seller of foreign editions of books published by Pearson and Wiley,

alleges that they, along with other publishers, agreed to engage in a variety of

anticompetitive conduct against importers of foreign editions of publications (such

as Liu) for the purpose of restraining competition and maintaining monopoly

positions in their publications. The centerpiece the alleged conduct relates to

coordinated litigation efforts against Liu and others. Liu also asserts that Pearson

1

and Wiley agreed between themselves and with others to enter into an agreement with an online retailer, Valorebooks.com, to refuse to deal with Liu. Finally, Liu asserts that Pearson and Wiley also entered into agreements with other online retailers such as Amazon.com and Half.com to refuse to deal with her.

Liu's allegations fail to state a cognizable antitrust claim. There is nothing unlawful regarding the Publishers' coordinated commencement of litigation to protect their copyrights from a similar course of conduct – even if that litigation fails. Such activity is protected by the Noerr-Pennington doctrine and does not otherwise constitute an antitrust violation. Liu's remaining allegations of concerted action fail for a number of reasons – but as a threshold matter, they all lack the required specificity as to the "who, what, when, and where" of the various alleged agreements. Without such supporting facts, the allegations are no more than speculation that something nefarious must have been (and still be) afoot. Such suspicions are insufficient to state a claim for an antitrust violation.

For the reasons set forth below, the Publisher's motion is GRANTED.

I.    FACTUAL ALLEGATIONS

For purposes of evaluating a motion to dismiss, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in plaintiff's favor. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). While the amended Counterclaims contain a variety of assertions, many of which are repeated

at different times, only the following are relevant to resolution of the instant motion.[1]

Liu imports foreign editions of various textbooks. The amended Counterclaims allege that Liu was a student up until 2001 and during that time experienced the high cost of textbooks. (Id. ¶¶ 95-98.) It appears that Liu's business of purchasing textbooks abroad and selling those foreign editions in the United States began during the time she was a student: she needed a statistics book and realized the version made in China was much cheaper; she called a friend in China to help order the book directly. (Id. ¶¶ 95-99.) "Having found this new source [of cheaper textbooks, Liu] began selling those books on Amazon.com and Half.com to supplement household income." (Id. ¶ 98.)

Among the publishers whose texts Liu purchases abroad for resale in the United States are those of the Pearson and Wiley. These companies, along with other publishers, are alleged to collectively control 87% of "the market for textbooks assigned by faculty teaching at United States colleges and universities." (FAC ¶ 8.) Pearson and Wiley together constitute 35.8% of that market. (Id.) Pearson and Wiley are not alleged to have any corporate relationship or affiliation.

Liu alleges that in the past, the Department of Justice found that Pearson and a textbook company with which it wanted to merge (a unit of Viacom) competed in "no fewer than 32 college textbook markets." (Id. ¶ 71.) Divestiture of a number

---

[1] While the amended Counterclaims do not tell a linear story, the Court has attempted to place the allegations in a logical, non-repetitive order for the sake of clarity.

3

of textbook titles was required as a condition of clearance. (Id. ¶ 72.) Liu alleges that Pearson and Wiley therefore compete with respect to trying to persuade college professors to choose their textbook. (Id. ¶ 75.)

According to Liu, both Pearson and Wiley charge more for U.S. editions of textbooks than for foreign editions. (Id. ¶ 80.) Liu further alleges that Pearson and Wiley take steps to discourage or deter the purchase of foreign editions for U.S. use by including statements such as "Not for sale in the U.S. or Canada" on an inside cover. (Id. ¶¶ 80-84.) Special online or bundled materials available only to purchasers also make it difficult to substitute foreign or used editions for new editions. (Id. ¶ 94.)

According to Liu, Pearson, Wiley, and other publishers joined together to "deal with" the problem of competition from used book sales. They allegedly engaged in all of the following conduct in order to reduce price competition: conspiring with each other to prevent copies of textbooks first sold in foreign markets from being resold in the U.S.; making "identical decisions" with respect to licensing their copyrights for distribution of foreign editions; and engaging in a "campaign" to reduce competition (and "impair" the First Amendment rights of U.S. booksellers and their customers) by instituting litigation and unnecessarily issuing new editions of textbooks or bundling additional materials with U.S. editions.

In support of these allegations Liu asserts that Pearson, Wiley, and other publishers have an economic interest in suppressing the sale of new and unused books sold outside of the United States. In furtherance of this interest, in 2006,

4

Pearson, Wiley and other publishers are alleged to have brought various and substantively identical lawsuits. (Id. ¶ 48.) In 2007, "they" jointly sued Valore, Inc., owner of the online bookstore, ValoreBooks.com. (Id. ¶ 49.) This litigation is alleged, without any detail, to have been a sham. (Id. ¶ 50.)

One of the lawsuits – brought against a reseller similarly situated to Liu – went to the Supreme Court on the issue of whether the first sale doctrine applied to foreign sales. Kirtsaeng v. John Wiley & Sons, Inc., – U.S. – , 133 S.Ct. 1351 (2013). The Supreme Court held that it does. Id. at 1356-57. Liu alleges that despite this ruling, Pearson and Wiley have refused to release those with whom they have "extracted agreements to suppress [foreign edition sales into the U.S.]." (FAC ¶ 57.)

At some point, Liu's seller accounts allegedly were blocked and she was informed these services did not want her selling international editions on their sites "but that it was not illegal for her to do so." (Id. ¶ 99.) Liu's accounts at Amazon.com, Abebooks, Alibris, eBay, and ValoreBooks.com all remain blocked. (Id. ¶ 57.) Liu alleges "upon information and belief" that Amazon.com and Half.com "blocked her accounts because of complaints from the respective book publishers, and not due to their own independent decision to refuse to do business with [her]." (Id. ¶ 100.)

Rising costs of textbooks have been the subject of various governmental inquiries. (Id. ¶ 89.)

II.     THIS LAWSUIT

On July 3, 2008, Pearson and Wiley sued Liu – along with Allen Air Conditioning Co., Jian Liu, all d/b/a JMBooks d/b/a Linda Liu, and John Doe Nos. 1 through 5, for copyright infringement and Lanham Act violations. (ECF No. 1.) On February 6, 2009, Liu first asserted antitrust counterclaims. (ECF No. 18.) On May 21, 2010, the Court of Appeals stayed those claims – as well as the remainder of the action – pending a decision in John Wiley & Sons, Inc. v. Kirtsaeng. (ECF No. 32.)

On March 19, 2013, the Supreme Court decided Kirtsaeng. Following this decision, Pearson and Wiley's copyright claims were dismissed. (ECF Nos. 51; 74.) On June 28, 2013, Pearson and Wiley moved to dismiss Liu's counterclaims. (ECF No. 57.) On October 21, 2013, the Court held a conference during which time it highlighted a number of pleading deficiencies in Liu's counterclaims. (ECF No. 97.) Liu was provided an opportunity to re-plead, and on December 4, 2013, she filed her amended Counterclaims. (ECF No. 108.)

On December 23, 2013, Wiley and Pearson filed a joint motion to dismiss Liu's amended Counterclaims. (ECF No. 115.) That motion became fully briefed on January 30, 2014. (ECF No. 127.)

The amended Counterclaims assert two antitrust and two state law claims. In addition to the allegations set forth above, the First Counterclaim asserts that the Publishers engaged in a violation of Section 1 of the Sherman Act based on the following:

6

1. "[S]ome publishers made an agreement with an online retailer outside the United States to limit the number of copies of a given textbook that can be delivered to a single U.S. address in one order." (Id. ¶ 104.)

2. "Pearson and Wiley both concede that they each communicated with one or more college textbook publishers on the topic of collectively restraining the sale of foreign edition copies in the United States before taking action against a bookseller or Internet sales portal to prevent the importation into the United States, or prevent the sale within the United States, of foreign edition copies of its works before first having communicated." (Id. ¶ 106 (emphasis in original).)

3. "On information and belief, coming in response to complaints from customers in the [U.S.], from concerns voiced to investors, from communications reported to the [Government Accountability Office], and lacking any plausible pro-competitive justification for their conduct, the inescapable conclusion is that Pearson and Wiley agreed with each other (and possibly with some of their customers) to take the joint action described above to suppress competition . . . ." (Id. ¶ 107.)

4. Wiley, along with other publishers, was a plaintiff in a lawsuit; it refuses to admit or deny whether it consulted with other co-plaintiff publishers in that lawsuit regarding whether it should accept a settlement offer from the defendant in that lawsuit. (Id. ¶ 109.)

7

5. "Pearson and Wiley, along with Cengage (Thomson) and McGraw-Hill, entered into an agreement with ValoreBooks.com, the online marketplace used by Ms. Liu, to refuse to allow Ms. Liu to sell her cheaper foreign edition books through their service." (Id. ¶ 113.)

6. "Upon information and belief, Pearson and Wiley also caused other online marketplaces, specifically Amazon.com and Half.com, to agree not to allow Mrs. Liu to sell Pearson books, Wiley books, or foreign edition books of their competitors through their online marketplaces." (Id. ¶ 114.)

7. "Pearson and Wiley both falsely accused Liu of infringing their copyrights, making these accusations to companies with which Liu was then doing business. They did so for the purpose of persuading those companies to interfere with Liu's lawful sales." (Id. ¶ 116.)

The second counterclaim asserts a violation of Section 2 of the Sherman Act for "monopolization of non-exclusive rights in secondary sales." (Id. at 37.) Here, Liu alleges that Pearson and Wiley have conspired with each other and with similarly situated textbook publishers to expand the scope of their lawful exclusive copyright by suppressing competition from foreign sales, publishing new editions of their books at an accelerated pace to diminish the period of usefulness of older versions, bundling copies of their works with other materials (e.g., password-protected online supplementary materials), and engaging in sham litigation. (Id. ¶ 122.)

8

Liu's final two counterclaims allege state law causes of action for tortious interference with existing and prospective business relations. (Id. ¶¶ 124-138.) These claims rely upon the same conduct regarding the online retailers as set forth above.

III. LEGAL STANDARDS

A. Motion to Dismiss

To survive dismissal, an antitrust complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Alt. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570); see also Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) (same). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

In applying this standard, the Court accepts as true all well-plead factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Id. If the Court can infer no more than "the mere possibility of misconduct" from the factual averments – in other words, if the well-pleaded allegations of the complaint have not "nudged claims across the line from conceivable to plausible," dismissal is appropriate. Twombly, 550 U.S. at 570; Starr, 592 F.3d at 321 (quoting Iqbal, 556 U.S. at 678).

In a case alleging a conspiracy under the antitrust laws, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." Twombly, 550

9

U.S. at 556. "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." Id. at 556-57. Put another way, it is not enough to simply allege an unlawful agreement; to survive dismissal, a Complaint must allege enough factual matter to plausibly suggest the parties entered into an anticompetitive agreement. In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007). Even "conscious parallelism" – a reasonable reaction of firms in a concentrated market when they recognize shared economic interests and interdependence with respect to price and output decisions – "is not itself unlawful." Twombly, 550 U.S. at 553-54 (internal quotation marks omitted and citing Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993)). "The inadequacy of showing parallel conduct . . . without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a "wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." Id. at 554 (citation omitted).

Accordingly, a district court retains the power to insist upon a certain amount of specificity before it opens the door to what may be massive discovery burdens. Twombly, 550 U.S. at 558.

B.      The Noerr-Pennington Doctrine

10

The <u>Noerr-Pennington</u> doctrine has its origin in the Supreme Court's

decisions in <u>Eastern Railroad Presidents Conf. v. Noerr Motor Freight, Inc.</u>, 365

U.S. 127 (1961), <u>United Mine Workers v. Pennington</u>, 381 U.S. 657 (1965), and

subsequent case law. <u>See, e.g.</u>, <u>Primetime 24 Joint Venture v. NBC, Inc.</u>, 219 F.3d

92, 100 (2d Cir. 2000). Under the <u>Noerr-Pennington</u> doctrine, "defendants are

immune from antitrust liability for engaging in conduct (including litigation) aimed

at influencing decisionmaking by the government." <u>Octane Fitness, LLC v. ICON</u>

<u>Health & Fitness, Inc.</u>, – U.S. – , 134 S.Ct. 1749, 1757 (2014) (citing <u>Professional</u>

<u>Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.</u>, 508 U.S. 49, 56 (1993)

("<u>PRE</u>")).

There is a "sham litigation" exception to the doctrine: sham litigation,

brought to cover an attempt to interfere directly with business relationships of a

competitor, or for the purposes of achieving that goal, is not immunized. <u>Id.</u> at

1757. To qualify as a "sham," a lawsuit must be "objectively baseless" and brought

"in an attempt to thwart competition." <u>Id.</u> (citing <u>PRE</u>, 508 U.S. at 60); <u>Primetime</u>

<u>24 Joint Venture</u>, 219 F.3d at 101 (reversing a district court's dismissal of claims as

covered by <u>Noerr-Pennington</u>, finding sufficient allegations of legal proceedings

brought without regard to the merits and for the purpose of injuring a market

rival.)[2]

---

[2] Even apart from application of the <u>Noerr-Pennington</u> doctrine, coordinated
enforcement of legal rights would typically have no discernible effect on
competition. <u>Primetime 24 Joint Venture</u>, 219 F.3d at 99. Without an effect on
competition, it could not rise to the level of an antitrust violation. <u>Id.</u>

11

C.    Antitrust Claims[3]

     1.    Antitrust Standing

Every plaintiff asserting a claim arising under the antitrust laws must allege

a sufficient basis for antitrust standing. Paycom Billing Servs., Inc. v. Mastercard

Int'l, Inc., 467 F.3d 283, 290 (2d Cir. 2006). Antitrust injury is the sine qua non of

antitrust standing. See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477,

489 (1977); see also Paycom Billing Servs., Inc., 467 F.3d at 290. "An antitrust

injury is an 'injury of the type the antitrust laws were intended to prevent and flows

from that which makes defendants' acts unlawful." Paycom Billing Servs., Inc., 467

F.3d at 290 (quoting Brunswick Corp., 429 U.S. at 489). "The injury should reflect

the anticompetitive effect either of the violation or of the anticompetitive acts made

possible by the violation." Brunswick Corp., 429 U.S. at 489. "The antitrust injury

requirement ensures that a plaintiff can recover only if the loss stems from a

competition-reducing aspect or effect of the defendant's behavior." Atlantic

Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990) (emphasis in original).

Even if a plaintiff can adequately allege antitrust injury, to have standing it

must also be an efficient enforcer of the antitrust laws. Paycom, 467 F.3d at 290-91

(finding that Paycom was not an efficient enforcer due to the indirectness of its

injuries and speculative damages). The "efficient enforcer" factors include:

---

(acknowledging that most questions of coordinated litigation are nevertheless
analyzed under the Noerr-Pennington doctrine.)

[3] There is a four year statute of limitations for antitrust actions. 15 U.S.C.A. § 15b.
The antitrust counterclaims in this action were originally asserted in February 6,
2009. (ECF No. 18.) Thus, while much of the conduct alleged extends back years,
the claims are in fact timely.

> (1) the directness or indirectness of the asserted injury;
> (2) the existence of an identifiable class of persons whose
> self-interest would normally motivate them to vindicate
> the public interest in antitrust enforcement; (3) the
> speculativeness of the alleged injury; and (4) the difficulty
> of identifying damages and apportioning them among
> direct and indirect victims so as to avoid duplicative
> recoveries.

Id. (internal quotation marks and citations omitted).

### 2.   Elements of a Section 1 Claim

Section 1 of the Sherman Act prohibits unreasonable restraints of trade.

State Oil Co. v. Kahn, 522 U.S. 3, 10 (1997) (citations omitted); Paycom Billing Svs.,

Inc., 467 F.3d at 289 (citations omitted).  Courts review challenged agreements

under either a "per se" or "rule of reason" theory.[4]  Paycom Billing Sys., Inc., 467

F.3d at 289.  The per se label is limited to those actions with which courts have

sufficient prior experience "to predict with confidence that the rule of reason will

condemn it." Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 344 (1982).

These types of agreements "have such pernicious and predictable anticompetitive

effects, and such limited potential for procompetitive benefit, that they are deemed

unlawful per se." Paycom, 467 F.3d at 289-290 (citing State Oil, 522 U.S. at 10).

Most antitrust claims are analyzed under the rule of reason analysis.  Id.

Horizontal agreements among competitors are classic types of per se claims.

NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135-36; see also Klor's, Inc. v.

---

[4] A showing of antitrust injury is required if the claim is analyzed under the rule of
reason or as a per se violation.  Atlantic Richfield Co., 495 U.S. at 344 (1990).

Broadway-Hale Stores, Inc., 359 U.S. 207, 212 (1959) ("Group boycotts, or concerted refusals...to deal..., have long been held to be [per se antitrust violations].")

Vertical agreements are typically not analyzed under the per se analysis. NYNEX, 525 U.S. at 135-37 (noting that vertical price fixing as an exception).

Claims for per se violations of Section 1 of the Sherman Act do not require allegations of relevant markets or a demonstration of market power. See Agnew v. National Collegiate Athletic Ass'n, 683 F.3d 328, 336 (7th Cir. 2012) ("Under the per se framework, a restraint is deemed unreasonable without any inquiry into the market context in which the restraint operates."); see also MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc., 62 F.3d 967, 976 (7th Cir. 1995) ("To state a claim for relief under Section 1, a plaintiff must allege either that the contract, combination, or conspiracy resulted in a per se violation of the Sherman Act or that it unreasonably restrained competition in a relevant market") (emphasis added) (citations omitted).

The Sherman Act does not prohibit a unilateral refusal of a trader or manufacturer to deal with another. United States v. Colgate & Co., 250 U.S. 300, 307 (1919); Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, 540 U.S. 398, 408 (2004) (citing Colgate, 250 U.S. at 307). However, concerted refusals to deal are analyzed as per se violations of the antitrust laws. Bogan v. Hodgkins, 166 F.3d 509, 515 (2d Cir. 1999) (explaining that a group boycott, "a concerted attempt by a group of competitors at one level to protect themselves from competition from non-

14

group members who seek to compete at that level" is illegal <u>per se</u>) (internal quotation marks and citation omitted).

### 3. Elements of a Section 2 Claim

Section 2 of the Sherman Act forbids "monopolization" and "attempted monopolization." 15 U.S.C.A. § 2. A claim brought under Section 2 requires the "possession of monopoly power in the relevant market" and "the willful acquisition or maintenance" of that monopoly position. <u>See</u> <u>Verizon Commc'ns, Inc.</u>, 540 U.S. at 407 (internal quotation marks and citation omitted).

The mere possession of monopoly power and charging of monopoly prices is not in and of itself unlawful – indeed, it is an expected and important element in a free-market system. <u>Id.</u>

### IV. DISCUSSION

Liu's counterclaims assert a host of concerted action by Pearson and Wiley along with non-defendant publishers. Despite an initial pleading and a conference with the Court in which it detailed deficiencies in that pleading, the amended pleading fares no better than the first.

The counterclaims allege the following acts:

- Concerted litigation in 2006;
- Concerted litigation against ValoreBooks.com in 2007;
- Following the <u>Kirtsaeng</u> decision, failure to change business practices with various online retailers and the blocking of Liu's accounts with various online retailers;

15

- An agreement with retailers outside the U.S. to limit the number of copies that can be delivered to a single U.S. address in a single order;

- Statements including on the covers or other parts of publications seeking to discourage purchasing foreign books for U.S. resale or distribution; and

- Unnecessarily publishing new editions or including special or bundled materials on new copies of publications.

A.    Standing

Pearson and Wiley argue that Liu lacks antitrust standing. Given the number of diverse claims Liu has brought, they are both correct and incorrect. As an initial matter, it is important not to confuse adequately pleading antitrust injury and the other elements of standing with a review of the merits of a claim. At a basic and high level, if it were the case that Pearson and Wiley agreed to undertake specific actions to prevent Liu from acquiring and selling foreign edition textbooks, such conduct could result in cognizable antitrust injury. The resulting decrease in output (that is, available foreign editions), might impact price competition in the U.S. Liu, as a seller of such textbooks, would be directly impacted in terms of units available. Her damages would not be unduly speculative. The Court disagrees, therefore, that such conduct would necessitate dismissal for lack of antitrust standing as to such claims.

Plaintiff, however, lacks antitrust standing with respect to claims as to those competing resellers (similarly situated to herself) such as ValoreBooks.com. To the

16

extent plaintiff's claims with regard to Valore are that it was the target (as was Liu) of coordinated litigation, Liu has not herself suffered antitrust injury as a result of that conduct. Put otherwise, if Pearson and Wiley harm one of Liu's competitors, it is unclear how that harms Liu. Indeed, preventing a competitor from obtaining used product would enhance Liu's competitive position vis-à-vis ValoreBooks.com.

To the extent Liu's claims regarding ValoreBooks.com, Amazon.com, Half.com, and others relates to their role as a <u>source</u> of product for her (e.g., that she purchases foreign editions from them for resale), such allegations are not made clearly. Assuming arguendo such a claim, in that context it is possible that the decreased availability of product to these online resellers would result in less product at higher prices for Liu (and others like her). That Liu's business model is the resale of such product does not, alone, defeat standing.

Liu's allegations regarding unnecessarily new editions and bundled features are also not a basis for standing. On their face, publication of new editions with up-to-date information and/or bundled additional materials are output-enhancing: they result in more, different, and improved product in the market. On their face, these allegations do not amount to the type of harm the antitrust laws were designed to address. <u>See</u> <u>Brunswick Corp.</u>, 429 U.S. at 488-89.

The Court assumes Liu has sufficient standing to pursue certain claims, but not others, as set forth above.

B.   <u>Coordinated Litigation</u>

17

With respect to coordinated litigation among publishers, the counterclaims assert that "[t]heir joint litigation action was a sham to cover collusion" and "was objectively baseless" (FAC ¶ 50) – but there are no specific allegations as to why that is so. For instance, there are no allegations that there was a meeting in a smoky room at which the publishers agreed to try to undermine Liu's business model of selling foreign edition books by bringing frivolous litigation against her. It is certainly more plausible that in pursuing the expense of litigation, publishers were engaged in a good faith and legitimate task of seeking to protect their copyrights. Twombly requires more for Liu to state a claim.

The coordinated litigation is also precisely the type of activity protected by Noerr-Pennington. While the counterclaims invoke the word "sham" and phrase "objectively baseless," there is nothing behind those words; they are merely rhetoric.

The public record, available to the Court on a motion to dismiss, see Chambers, 282 F.3d at 153, suggests that the publishers deeply believed in their litigation position. Both Kirtsaeng and this case have been fought long and hard – Kirtsaeng making its way to the Supreme Court. The Supreme Court's ruling clarified – for the first time – that the "first sale" doctrine applies to copyrighted goods sold outside of the United States. 133 S.Ct. at 1356-57. This ruling was by no means a foregone conclusion. The position of the plaintiffs in that case and this cannot be said to have been "objectively baseless." Accordingly, such coordinated litigation activity is immunized from antitrust liability. Primetime 24 Joint Venture, 219 F.3d at 100-01.

18

Liu argues that F.T.C. v. Actavis, Inc., – U.S. – , 133 S.Ct. 2223 (2013) "blows away the Noerr-Pennington fig leafs." (Defendant Ganghua Liu's Opposition to Plaintiffs' Third Motion to Dismiss her Counterclaims ("Def.'s Opp'n") at 3, Jan. 23, 2014, ECF No. 122.) This misunderstands Liu's own claims as well as those in Actavis. Actavis concerned an entirely different type of activity – reverse settlement payments between one holder of a drug patent and two generic manufacturers. Actavis, Inc., 133 S.Ct. at 2230. The agreement was alleged to be a "pay for delay" agreement: the patent holder pays generics to remain out of the market for a period of time. The Court's focus was on reviewing not only the patent policy implications (but extending patent exclusivity), but also antitrust policies. Id. at 2231. The Court reiterated the longstanding proposition that patent settlements can sometimes violate the antitrust laws. Id. at 2232. The Court found that depending on the particular terms of a settlement, a settlement may in fact provide the basis for an antitrust claim. Id. at 2237. The Supreme Court declined to find that such settlements were presumptively unlawful. Id.

Actavis did not narrow the Noerr-Pennington doctrine.

C.    Failure to Reverse Business Practices

Liu alleges that following Kirtsaeng, Pearson, Wiley, and other unspecified publishers failed to alter their business practices and that Liu's accounts were blocked and remain blocked. This allegation – to the extent that is even an allegation of unlawful concerted action – fails for a number of reasons. First, it lacks the requisite specificity under Twombly: there are no specific allegations

19

leading to any plausible inference that any particular publisher ever met with any other publisher to discuss and agree on business practices vis-à-vis Liu or vis-à-vis even others selling foreign editions of publications in the U.S.  There are no allegations that any of the online retailers met with a group (or representative of a group) of publishers to execute the coordinated strategy.

Indeed, the plausible inferences to be drawn are far more consistent with lawful, unilateral behavior.  Each online retailer may – under <u>Colgate</u> and its progeny – deal with whomever it pleases on terms it can negotiate.  250 U.S. at 307. That certain online retailers have chosen not to deal with Liu is more consistent with maintaining lucrative relationships with the publishers whose textbooks result in new sales at higher margins on a regular basis.

Each publisher plainly has an incentive for online retailers to buy new texts from them – texts for which they receive the purchase price (versus used texts for which they do not), as well as to carry their most up to date, robust domestic editions (the allegations of the counterclaims make it clear that the foreign editions resold into the U.S. are neither as up to date nor as robust).

In addition, Liu does not allege any detail with regard to who has an agreement with whom, nor does she explain the relevant terms of such agreement. Thus, it is impossible to know whether the offending agreement is a horizontal agreement, a vertical agreement, a rimless conspiracy, a rimmed conspiracy, or none of the above.

Without the basic contours of any allegedly unlawful agreement, this Court cannot analyze whether there are, for instance, sufficient procompetitive reasons apparent for any practice to make an unlawful agreement implausible. For instance, a vertical agreement between a publisher and online retailer that merely requires the online retailer to carry the most recent edition of a textbook has obvious procompetitive justifications – it ensures that a purchaser is obtaining the most up to date version. Similarly, an agreement between a publisher and an online retailer prohibiting the retailer from dealing in used versions of that publishers books has a procompetitive justification found in the very allegations of the counterclaims themselves: the U.S. editions have different content.

In the absence of any specific allegations, the Court will not assume that there is a horizontal agreement between publisher-competitors to all pursue similar exclusionary policies. As the Supreme Court found in <u>Twombly</u>, mere parallel conduct alone is not a basis for an antitrust claim. 550 U.S. at 556-57.

D.     The Monopolization Claim

Liu also alleges claims under Section 2 of the Sherman Act for monopolization of "non-exclusive rights in secondary sales." This claim appears to allege that Pearson and Wiley used exclusive rights they have in certain works to try and monopolize rights that they do not have, for instance, the right to resell foreign editions into the U.S. This claim fails for a number of reasons. As an initial matter, all claims under Section 2 of the Sherman Act require that a plaintiff allege a cognizable market, that the defendant have market power, and that the defendant

21

engage in conduct to wilfully maintain or extend that position. None of these elements have been adequately alleged here.

Liu has failed to allege a cognizable relevant market; the relevant market she appears earlier in her counterclaims to be pursuing (relating to college textbook titles) has given way in the second Counterclaim to a generalized statement of conduct in no clear market.

In the absence of an adequately pled relevant market, there cannot be sufficient allegations of monopoly power. The second Counterclaim must be dismissed.

E.    Liu's State Law Claims

Having dismissed Liu's federal antitrust claims, the Court declines to assert supplemental jurisdiction over the state law claims. Those claims are dismissed.

V.    CONCLUSION

For the reasons set forth above, the Publishers' motion to dismiss the Amended Counterclaims is GRANTED. The Clerk of Court is directed to terminate the motion at ECF No. 115 and to terminate this action.

SO ORDERED.

Dated:      New York, New York
            May 22, 2014

_____
KATHERINE B. FORREST
United States District Judge

22